LATHAM & WATKINS LLP
  Melanie M. Blunschi (Bar No. 234264)
  Elizabeth C. Gettinger (Bar No. 307683)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: +1.415.391.0600
Facsimile: +1.415.395.8095
*melanie.blunschi@lw.com*
*elizabeth.gettinger@lw.com*

*Attorneys for Plaintiff Apple Inc.*

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA CLARA – UNLIMITED JURISDICTION

| | |
|---|---|
| APPLE INC.,<br>            Plaintiff,<br>v.<br>ALLAN & ASSOCIATES LIMITED, A2 GLOBAL RISK LIMITED, BRADLEY JAMES ALLAN, and DOES 1-100, inclusive,<br>            Defendants. | CASE NO. 19CV358715<br><br>**COMPLAINT FOR:**<br><br>**1. BREACH OF CONTRACT.**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Apple Inc. ("Apple") states as follows in its Complaint against Defendants Allan & Associates Limited ("Allan & Associates"), A2 Global Risk Limited ("A2 Global Risk"), Bradley James Allan, and Does 1-100, inclusive, and their agents and assigns (collectively, "A&A"):

## INTRODUCTION

1. Defendant A&A had a discrete but important role in Apple's innovative electronics recycling program: as Apple's security consultant, it was A&A's job to watch the destruction of electronics to ensure that Apple's recycling vendor actually destroyed the electronics that had been provided to be recycled. But A&A did not do that. Instead of confirming that iPhones and other electronics were destroyed, A&A ignored the recycling vendor yet continued to collect money from Apple as though it were performing as required. As a direct result of A&A's failures, the recycling vendor was able to steal Apple products that should have been recycled and resell them on the secondary market, causing substantial damage to Apple.

2. Apple designs, markets, and sells computers, tablets, and phones to consumers all over the world. Demand for consumer electronics—including personal electronic devices in particular—has grown exponentially in the past decades. To combat the flow of electronics into the world's landfills, Apple established an environmentally friendly recycling program whereby customers can trade in or turn over their used devices to Apple, and Apple will arrange for their destruction and recycling—at no charge to the consumer.

3. Since Apple is recognized as a global leader in consumer technology innovations, its parts are quite valuable and highly sought-after. That is why Apple hired security vendor A&A to oversee and secure the recycling process. Accordingly, the fundamental purpose of Apple's contract with A&A here was that A&A would witness *in-person* the destruction of Apple's devices to ensure that every component or device that Apple sent to its recycling vendor would indeed be destroyed, beyond use, and recycled in a manner that yields the highest reusable commodity-grade materials. Throughout the term of its services agreement with Apple, A&A certified in writing that A&A employees had audited the destruction of Apple's parts and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

devices. Apple did not suspect that A&A was falsifying the certifications and misleading Apple about A&A's fulfilment of its duties.

4. However, in late 2015, Apple discovered that a recycling company's employees had been stealing Apple devices and parts. Further investigation revealed that, despite A&A's assurances, A&A *never* actually witnessed destruction of Apple's materials. The recycling vendor's employees were able to steal Apple's parts and replace them with other scrap material while A&A's auditors were absent. A&A employees only visited the recycling company's facilities after the destruction process purportedly was complete to record the end weight of each shipment and certify the destruction.

5. A&A failed to perform its most basic duties under its services agreement with Apple, affirmatively misled Apple about A&A's performance, and unquestionably caused Apple substantial damage. By this Complaint, Apple seeks to hold A&A accountable for its actions.

**PARTIES & VENUE**

6. Plaintiff Apple is a corporation organized and existing under the laws of California with its principal place of business at One Apple Park Way, Cupertino, California 95014.

7. Defendant Mr. Allan is an individual doing business in Hong Kong, China. Mr. Allan is the founder and sole shareholder and director of both Allan & Associates and A2 Global Risk. Apple is informed and believes that Mr. Allan resides in Hong Kong, China.

8. Defendant Allan & Associates is a security and crisis management consulting company organized, located, and headquartered in Hong Kong, China. Its principal place of business is Room 1906, 19/F, Lee Garden One, 33 Hysan Avenue, Causeway Bay, Hong Kong. During the relevant time period, Allan & Associates also conducted business under the name Allan & Associates Inc.

9. Defendant A2 Global Risk is a security risk management consulting company headquartered in Hong Kong, China. Its principal place of business is Suite 2004, 20/F., Tower 5, China Hong Kong City, 33 Canton Road, Tsim Sha Tsui, Kowloon, Hong Kong. Mr. Allan incorporated A2 Global Risk on September 13, 2018.

10. Apple is informed and believes A2 Global Risk and Allan & Associates are the same company. In April 2016, Allan & Associates listed A2 Global Risk as a "service" on Allan & Associates' website. On August 8, 2018, Mr. Allan indicated the companies were one and the same by referring to "Allan & Associates / A2 Global Risk" as a single company in a post published to his LinkedIn profile. Until recently, the Allan & Associates website, www.allan-assoc.com, redirected visitors to the A2 Global Risk website, www.a2globalrisk.com. Upon information and belief, Allan & Associates and A2 Global Risk have all or substantially the same employees, and the companies conduct the same business. A2 Global Risk is thus the same company as Allan & Associates and is liable for the debts of Allan & Associates.

11. Apple is unaware of the true names and capacities of defendants sued herein as Does 1-100, inclusive, and therefore sues these defendants under such fictitious names. Apple alleges that each of these fictitiously named defendants is in some way responsible for the acts alleged herein. Apple will amend this Complaint to allege the true names and capacities of these fictitiously named defendants, whether individual, corporate, or otherwise, once Apple has ascertained that information.

12. Each defendant is and was the agent and/or alter ego of each other defendant, or is otherwise responsible for the acts hereinafter alleged. The actions of each defendant, as alleged herein, were duly ratified by each other defendant, with each defendant acting as the agent of the other and within the scope, course, and authority of the agency.

13. Venue is proper in this Court because the operative Services Agreement provides that "[a]ny action or proceeding between the parties relating to th[e] Agreement shall take place in Santa Clara County, California." Venue is also proper in this Court pursuant to California Code of Civil Procedure § 395 because no defendant resides in the United States, and Apple's principal place of business is in Santa Clara County, California.

## BACKGROUND

**A.   Apple's Industry-Leading Recycling Program**

14. Electronic Waste ("E-Waste") is the term for discarded electronics and appliances, which typically includes computers, televisions, cell phones, and other electronic

1  systems. With increasing technological advances, the world's population has steadily increased
2  its output of E-Waste, reaching more than 49 million metric tons of E-Waste in 2018 alone.
3        15.     Responding to the growing need for environmentally friendly recycling practices,
4  Apple recycles electronic scrap material that may not perform to Apple's standards. This
5  program is part of Apple's goal of eliminating waste sent to landfills from its manufacturing
6  facilities, retail stores, corporate offices, and data centers, and recycling materials in a manner
7  that yields the highest usable commodity-grade materials.
8        16.     Apple also established a recycling program that allows customers to trade in any
9  Apple device, including batteries, which is then recycled through environmentally responsible
10 processes at no charge to the customer.
11       17.     As part of the recycling program, Apple instructs customers on how to erase their
12 data to ensure all personal information is removed from the device, and then sends devices and
13 components to be recycled in facilities located around the world.

**B.   The Services Agreement Between Apple and A&A Required A&A to Witness and Oversee the Destruction Process**

16       18.     Apple hired A&A to oversee the recycling process undertaken by a specialized
17 recycling company (the "Recycling Company") and enforce certain security measures. Apple
18 and A&A entered into Services Agreement number CP20121121 (the "Services Agreements")
19 on March 1, 2012. As A&A's Director, Mr. Allan signed the Services Agreement.
20       19.     The Services Agreement required A&A to: (i) escort product, (ii) verify product
21 types, quantities and weights, (iii) verify packaging materials and seals, (iv) verify recycling
22 processes and outcomes, and (v) security postings. The Services Agreement defined each task as
23 follows:

    i.    **Product escorts** means accompanying a truck, trailer, container or vehicle that carries products to and/or from Apple-designated locations. The locations include, but are not limited to airports, manufacturers, recycling facilities, storage facilities and offices.

    ii.   **Verification of product types, quantities and weights** means performing on-site, witnessed affirmation of the types, quantities and weights of Apple parts, components, sub-components and finished goods. . . . .

4

    iii. **Verification of packaging materials and seals** means on-site, witnessed affirmation of the integrity of the packaging materials including boxes, cartons or other containers in which Apple products are transported, security seals affixed to individual boxes, shrink wrap and security tape affixed to pallets and their contents, and seals affixed to the doors of trucks or trailers which contain the Apple products being transported.

    iv. **Verification of recycling processes and outcomes** means on-site, witnessed affirmation of the manual and mechanical destruction Apple parts, components, sub-components and finished goods, including the beginning and ending weights of the products being destroyed. . . . .

    v. **Security postings** means physical presence, observing and documenting, people, processes, equipment and outcomes of the processes, witnessed affirmation of the arrival of trucks, trailers or other vehicles, the integrity of the truck seal, pallets, boxes and weights of Apple products contained on each vehicle, witness and document the loading and unloading of trucks, trailers and other vehicles at various locations for the transport of products to and from Apple-authorized manufacturers, recyclers, offices and storage locations, the affixing and removal of a unique seal at the storage location, timely completion of certain Apple-provided forms, timely accessing of certain Apple-provided databases to upload forms, photographs or other information that may be reasonably required from time-to-time. . . . .

20. Under the Services Agreement's Warranty provision, A&A represented and warranted that:

    i. it has full power to enter into this agreement and to carry out its obligations under this Agreement;

    ii. the Services shall be completed in a professional, workmanlike manner, with the degree of skill and care that is required by good, and sound professional procedures; and

    iii. the Services shall be completed in accordance with applicable specifications and statements of work and shall be correct and appropriate for all the purposes stated therein.

21. In sum, the central purpose of the Services Agreement entered into by Apple and A&A was that A&A employees would witness in-person—and A&A would verify in writing that its employees had witnessed—the destruction of Apple materials. A&A represented that it would undertake all such work in a professional and workmanlike manner.

22. The Services Agreement also provides for the safeguarding and nondisclosure of Apple's products. The Services Agreement defined "Apple Confidential Information" to include

"information concerning Apple's products."  The Services Agreement placed certain confidentiality obligations on A&A as follows:

> Supplier shall not disclose any Apple Confidential Information to any third party or otherwise, and shall take all reasonable precautions to prevent its unauthorized dissemination, both during and after the term of this Agreement.

23. Thus, the Services Agreement's confidentiality obligations required A&A to "not disclose" any Apple products "to any third party" and to "take all reasonable precautions to prevent its unauthorized dissemination."

24. The Limitation of Liability provision in the Services Agreement provides an exception to its limitations in the event of A&A's breach of its confidentiality obligations.

25. Apple has strict security measures in place that A&A was required to follow to secure and oversee the recycling process—including providing security escorts for materials, measuring the beginning and ending weights of each shipment to ensure no materials were missing, and use of secure packaging for each shipment.  The Services Agreement also required A&A to be on-site to witness the destruction of Apple parts and products.  A&A submitted signed certifications confirming that it had complied with all security measures required by the Services Agreement.

26. Apple began sending materials slated for recycling to the Recycling Company in September 2013.  For the next two years, A&A sent Apple regular "On-Site Destruction Reports," certifying that it was witnessing and overseeing the Recycling Company's work and confirming that A&A was enforcing Apple's strict security measures as set forth in the Services Agreement.  The On-Site Destruction Reports specifically stated that "Allan & Associates have audited the destruction of [specific shipments] in order to obtain adequate assurance regarding the undertaken procedures and conditions" and noted the number of pallets of Apple parts that had been "destroyed beyond use by the" Recycling Company personnel.

27. From September 2013 through 2016, A&A also submitted monthly invoices to Apple for work allegedly performed under the Services Agreement.  Apple paid each invoice.

28. The parties amended the Services Agreement in February 2013, February 2015, and January 2016, to extend the termination date through January 31, 2017.  The amendments

made no other changes to the Services Agreement. Mr. Allan signed each amendment.

**C.    Defendants Breached the Services Agreement and Submitted Fraudulent Written Confirmation That A&A Witnessed the Recycling Process**

29.    In late 2015, Apple discovered that Recycling Company employees had been stealing Apple parts and finished devices, including large quantities of main logic boards. Main logic boards are an integral (and the most expensive) part of a finished device. Without the main logic board, a phone will not run iOS, the operating system that allows an iPhone to work. In other words, main logic boards are valuable parts of Apple's iPhones. They are highly sought after and sold on the secondary market.

30.    At the end of 2015, members of Apple's audit compliance and global security team visited the Recycling Company's Singapore recycling facility to investigate anomalies observed in Apple's data analysis. Apple's investigation revealed the Recycling Company employees were able to circumvent Apple's security measures because A&A did not witness the destruction process. In other words, the security company Apple hired—and paid—to oversee and secure the recycling process did not do the work Apple hired it to perform. The investigation showed that A&A failed to perform its obligations under the Services Agreement.

31.    Apple's investigation revealed that the dozens of A&A employees who were on site at the Recycling Center facilities would certify the weight of Apple's products to be recycled and take photos of samples of the material. However, rather than watching the recycling process to confirm Apple's materials were destroyed, A&A's employees would leave, allowing the Recycling Company's employees to steal parts. Afterward, the Recycling Company's employees would fill boxes with a mix of Apple and non-Apple scrap material so that the beginning and end weights matched. A&A's employees would return to weigh the materials at the end of the process and certify the destruction.

32.    The Recycling Company hired an independent company to conduct an independent investigation into the theft. That company's findings confirmed that A&A employees did not oversee the entire recycling process.

33.    Mr. Allan was present at the facility during Apple's investigation. After

1  conducting his own internal investigation and discussions with his staff, Mr. Allan acknowledged that his employees had not witnessed the recycling process at the Recycling Company's Singapore facility and admitted that A&A did not do their job.

34. Furthermore, Apple's audit compliance and global security team spoke with other A&A employees, including Nuqman Hadi (a supervisor based in Singapore), Tracy Wang (a manager based in Hong Kong), and Yi Hong (an auditor based in Singapore). All of these employees admitted to Apple's audit compliance and global security team that no one from A&A had witnessed the recycling process or otherwise enforced Apple's security measures. Specifically, Mr. Hadi and Mr. Hong confirmed that A&A's Singapore auditors only took photographs of the materials to be crushed and did not witness the destruction process. Ms. Wang stated that she understood A&A auditors were required to witness the entire process—including the mechanical destruction of Apple materials—and confirmed that was the procedure other A&A auditors followed at other recycling sites located in Hong Kong and China. She further concluded that A&A's Singapore auditors did not witness the destruction process and could not explain why. Apple's audit compliance and global security team additionally received confirmation from the Recycling Company that no one from A&A had ever witnessed the recycling process.

35. Video footage and photographs from the Recycling Company show that A&A did not remain in its facilities to watch the destruction process. Recycling Company employees further confirmed that no one from A&A had ever witnessed the recycling process or enforced security measures at their facilities.

36. Finally, A&A provided a report to Apple in which it confirmed that employees had deviated from the process set out in the Services Agreement. The report revealed various operational weaknesses that may have further contributed to the theft of Apple's materials. A&A admitted in the report:

> Due to lack of manpower and unreported environmental factors such as noise and dust, the operations in the destruction area were not always under Allan & Associates supervision. However the auditors were present at the beginning of each SA destruction process and at the end. The auditors monitored the destruction completely or conducted period[ic] inspections during the process.

37. As confirmed in the videos and interviews conducted, the auditors were not present at the beginning of each destruction process. The auditors only took photographs for documentation purpose. They did not witness the scrapping of the parts as required.

38. Even though A&A and Mr. Allan knew no A&A employees were present at the Recycling Company facilities during the destruction, they knowingly sent falsified reports, certifications, and invoices to Apple affirmatively representing that A&A was doing the job Apple hired it to do and that it was performing it in accordance with the terms of the Services Agreement.

39. Apple believed Mr. Allan and A&A's representations were true and justifiably relied upon them in paying A&A's invoices and in extending the term of the Services Agreement in each Amendment. Apple would not have paid A&A's invoices or extended the term of the Services Agreement had it known Mr. Allan and A&A's representations and certifications were false.

40. Mr. Allan designed and knowingly participated in the scheme to cause A&A to materially breach the Services Agreement. Mr. Allan executed the Services Agreement on behalf of A&A as A&A's Director. Mr. Allan then knowingly failed to send A&A employees to the Recycling Company's facilities to oversee the destruction of Apple's material. Mr. Allan also oversaw the creation of false records and submission of them to Apple with the intent that Apple rely upon them and continue to pay A&A for invoices Mr. Allan submitted to Apple.

41. As the sole director, shareholder and founder of A&A, Mr. Allan had sole control over the company, including direct control over whether A&A employees were sent to the Recycling Company's facilities. As the sole shareholder, director and founder of A&A, Mr. Allan personally benefitted from and directly participated in the fraudulent scheme and is liable to Apple for all associated damages. If these acts are treated as those of A&A alone, it would sanction Mr. Allan's fraud and promote injustice by allowing Mr. Allan to escape personal liability for debts owed to Apple.

42. If A&A had performed under the Services Agreement, the Recycling Company employees would not have been able to steal Apple materials, or A&A would have known about

1  and alerted Apple immediately after the theft occurred—allowing Apple to immediately recover
2  the stolen materials or to put in place remediation processes.  Indeed, on one occasion when
3  Apple employees were present to oversee the recycling process, Apple's materials were
4  destroyed without any theft.  Moreover, if A&A had not affirmatively represented that the
5  company was overseeing the recycling process and following Apple security measures, Apple
6  would have immediately investigated the Recycling Company facilities and/or sent another
7  security firm to perform the work dictated by the Services Agreement.

8  43. As a proximate result of A&A's conduct, Apple has suffered harm, including, for
9  example, paying for services it did not receive, the costs of Apple's investigation, and other
10 damages totaling millions of dollars in an exact amount to be established at trial.

## CAUSE OF ACTION

### (Breach of Contract)

13  44. Apple incorporates by reference the allegations in Paragraphs 1 – 43 above as
14  though fully set forth herein.

15  45. Apple and A&A entered into the Services Agreement on March 1, 2012 and
16  extended the term of the Services Agreement through various amendments through January 31,
17  2017.  Apple performed all, or substantially all, of its obligations under the Services Agreement
18  by submitting payment to A&A.

19  46. The Services Agreement required A&A to send its employees to observe the
20  recycling process at the Recycling Company's facilities, to provide security escorts for transfer
21  of Apple materials, and to enforce Apple's other security measures designed to preserve Apple
22  materials, among other obligations.  A&A did not perform these or any of its obligations under
23  the Services Agreement.  As a result, A&A materially breached the Services Agreement.

24  47. A&A's breach directly harmed Apple.  Apple put in place strict security measures
25  to prevent the theft of Apple materials.  Apple specifically hired A&A to ensure these security
26  measures were followed and to generally ensure the Recycling Company performed its duties
27  without issue.  Had A&A performed its obligations under the Services Agreement, A&A would
28  have caught or prevented the Recycling Company employees' theft.  As a direct and proximate

result of A&A's breach of the Services Agreement, Apple has incurred substantial costs, including but not limited to the costs of its investigation and recovery of stolen materials, attorney's fees, and expenses.

**DEMAND FOR RELIEF**

48.   WHEREFORE, Apple respectfully prays that this Court enter judgment against Defendants as set forth below:

   i.   For restitution to Apple of all sums paid to A&A pursuant to the Services Agreement;

   ii.  For damages in the amount according to proof at the time of trial;

   iii. For all of Apple's attorney's fees and costs of suit incurred herein;

   iv.  For pre-judgment and post-judgment interest on all sums awarded; and

   v.   For such further relief as this Court may deem just and proper.

Dated:  November 15, 2019            LATHAM & WATKINS LLP

                                     By /s/ Melanie M. Blunschi
                                     Melanie M. Blunschi (Bar No. 234264)
                                     Elizabeth C. Gettinger (Bar No. 307683)
                                     505 Montgomery Street, Suite 2000
                                     San Francisco, California  94111-6538
                                     Telephone:  +1.415.391.0600
                                     Facsimile:  +1.415.395.8095
                                     melanie.blunschi@lw.com
                                     elizabeth.gettinger@lw.com

                                     *Attorneys for Plaintiff Apple Inc.*